[No. 5496.]

GALBREATH ET AL. v. WALLRICH ET AL.

1.. **Assignment of Chose in Action—How Effected—**As be-tween assignor and assignee no particular writing, and no particular form of words, is essential.—(540)

**Effect—**One assigning a non-negotiable executory contract does not warrant that it will be performed by the other party thereto, but merely that the contract is what it purports to be. —(542)

2. **Assent to—**Where, by the terms of an executory contract one of the parties is prohibited from assigning it without the consent of the. other, such assent may be verbal, and without any form of words, and when the assignment is accepted, on the faith of such assent, the assent cannot be withdrawn or withheld.—(545)

3. **Contracts—Rescission—**The cancellation by a railway company of a contract for the manufacture of ties, does not affect the other party thereto who has, with the consent of the railway company, assigned the contract in good faith to a third person; nor is the assignee entitled to rescind his purchase, merely on the ground of such cancellation.—(546)

*Appeal from Rio Grande District Court* — Hon. C. C. HOLBROOK, Judge.

Messrs. HAYT, DAWSON & WRIGHT, and Mr. JESSE C. WING, for appellants.

Messrs. RICHARDSON & HAWKINS, for appellee.

Mr. JUSTICE GABBERT delivered the opinion of the court:

The main question presented by this appeal is the right of appellees to rescind a contract which they had entered into with appellants. Charles A. Galbreath and Wilmot E. Broad were partners engaged in conducting a general store, manufacturing lumber and cross-ties, and operating sawmills, near South Fork, in Rio Grande county, under the firm name of Charles A. Galbreath & Company. A part of such business consisted in manufacturing railroad

ties, under contracts with the Denver & Rio Grande Railroad Company. Christian Wallrich and J. H. Kellogg, in connection with Galbreath, entered into a contract to purchase the business of the firm of Galbreath & Company, February 25th, 1904, paid part of the purchase money, and entered into possession and began to conduct the business on their own account. Within a short time thereafter, Wallrich and Kellogg notified Galbreath & Company that they had elected to rescind their contract of purchase, upon the ground that the tie contracts above referred to had not been assigned, as agreed. The appellants then brought suit to recover the balance of the purchase money remaining unpaid. The appellees, by way of cross-complaint, sought to have the contract of purchase rescinded, for the reason that the tie contracts had not been assigned. A trial was had to the court, with the result that a judgment was rendered, rescinding the contract of sale, and for the purchase money which defendants had paid the plaintiffs. The plaintiffs bring the case here for review on appeal.

The judgment of the court was based upon the ground that the failure of the plaintiffs to assign the tie contracts, and to obtain the assent of the railroad company to such assignment to the defendants, justified the latter in rescinding the contract of purchase. In determining the cause, the trial judge said, in part:

"It is clear to the court from the evidence, that the tie contracts were the incentive to the maintaining of sawmills, supply store, etc., at South Fork, and constituted the principal inducement to Wallrich and Kellogg to invest their money in the enterprise. It further appears that no assignment of said tie contracts could be made effective without the consent and action of the D. & R. G. R. R. Co."

So that the right of the defendants to rescind turns upon the facts relative to these contracts. The contract of sale provided:

"That the parties of the first part hereby sell to the parties of the second part the business conducted by them at South Fork, in the county of Rio Grande, state aforesaid, in the firm name of Charles A. Galbreath & Co., consisting of lumber, railroad tie manufacturing business, general merchandise, and blacksmith business, together with all existing contracts belonging thereto; also, 160 acres of timber land (describing it) at the price and conditions attached herewith, and deliver the same free of all indebtedness or encumbrances whatsoever."

It further provided: "The said J. H. Kellogg and Christian Wallrich agree to deposit their checks for the sum of two hundred and fifty dollars each as a guarantee of good faith, the same to be counted as part payment when the balance is paid, after inventory is complete, as their share of said business, same to be left with this agreement in escrow in the hands of Ernest Shaw, of Rio Grande county, Colorado, until the transfer is fully completed."

Attached to this contract was an inventory of the articles sold. This inventory included two sawmills, wagons, horses, 160 acres of land, office fixtures, blacksmith shop and tools, and other items which were valued at $7,000.00. In this inventory appears an item, "Royalty to be paid, $400.00," which the evidence establishes was the value the parties placed on the tie contracts. The inventory also contained further items, and provided that the blacksmith shop and merchandise stocks were to be invoiced. As rapidly as the property was invoiced, it was turned over to the purchasers, who at once entered into possession, and commenced to conduct the business in their own name, and also to manu-

facture the ties provided by the tie contracts. The business of the new concern appears to have commenced March 1, 1904, as a notice to that effect was posted at the office where the business was conducted. The checks deposited in escrow were turned over to the purchasers immediately after the invoice was completed, and Wallrich gave Galbreath two checks, one which about covered his share of the purchase price remaining unpaid, and one for a part of Kellogg's share, which he had drawn and given Wallrich to deliver to Galbreath, it then being agreed that the remainder of Kellogg's share was to be paid by his note. The land was not conveyed, nor was any formal assignment of the tie contracts made, for the reason that the purchasers intended to form a corporation, to be known as The Rio Grande Lumber & Supply Company, to take over the business and property purchased, and the conveyance and formal assignment were delayed, so that they might be made direct to the corporation. At the time the contract was entered into between the parties, there were three contracts between the plaintiffs and the railroad company, two of which were practically filled. The one not completed was for 50,000 ties, for which plaintiffs were to be paid at the rate of $32\frac{1}{2}$ cents per tie. The only ground upon which the defendants base their right to rescind the contract of purchase is, that these contracts were not assigned, nor the assent of the railroad company to such assignment obtained. By the contract entered into between the parties, it is clear that these contracts were duly assigned, so far as plaintiffs are concerned. As between assignor and assignee of a chose in action, no particular form of words or instrument is necessary. Any form of instrument from which it appears that an assignment was, in fact, made, is sufficient.—2 Enc. 1055. It is, therefore, clear, as

between the parties, that the contracts were assigned, and no formal endorsement thereon to that effect was necessary.

The fact that the railroad company subsequently canceled the tie contracts, and refused to allow the defendants to fill them, does not, of itself, impose any liability on plaintiffs. This act on the part of the railroad company was not taken because of any claim upon its part that the contracts had not been executed by it. The assignment of a non-negotiable contract does not carry a warranty that it will be performed. The assignee merely impliedly warrants that the contract is what it purports to be; or, in other words, that it is genuine.—15 Enc. 1241; *Giffert v. West,* 33 Wis. 617; *Daskam v. Ullman,* 74 Wis. 474; *Flynn v. Allen,* 57 Pa. St. 482.

By the contracts in question, the plaintiffs were appointed agents of the railroad company to manufacture ties from timber on government lands in the vicinity of South Fork, and we shall assume, for the purposes of this case, that the assent of the railroad company to the assignment of the contracts was necessary, and were such an essential part of the business and property purchased that, if they were not, in fact, obtained by the defendants, they were justified in electing to rescind their contract with plaintiffs. So that, reduced to its final analysis, the rights of the parties depend upon whether or not the assent of the railroad company had been obtained, or, in the circumstances of this case, was necessary, after the contract of purchase was executed and the purchasers entered into the possession of the property purchased. In other words, the case turns upon whether or not defendants obtained the contracts in question, and this proposition depends upon whether the railroad company had assented to the transfer of such contracts.

Prior to the contract of February 25th, Wallrich and Kellogg had interviewed a Mr. Tipton, purchasing agent for the railroad company, who had executed the tie contracts on behalf of the company, for the purpose of ascertaining whether or not the railroad company would assent to the transfer of the contracts to them. Wallrich testifies, in substance, that he asked Tipton if he would have any objection to the transfer of the tie contracts, and the latter said that "as far as he knew at that time, he would not have." He further says: "If Mr. Tipton had told us then that he would not transfer these contracts, we would not have gone on with the deal. That is why we went to him. On the 25th of February, when we made this deal, I thought there would be no trouble about these contracts."

Plaintiff Broad testified that, prior to the date the deal was consummated, he heard Mr. Wallrich say "that he was satisfied, so far as the business being transferred to the three successors was concerned, that he was perfectly satisfied that he would get the business; that the successors of Charles A. Galbreath & Company would get the business; that Mr. Tipton was perfectly willing they should."

Kellogg testified: "I made inquiries from Mr. Tipton to know that my services would be acceptable, if I should close this transaction, and he said that my services had been satisfactory. So far as he could see, there would be no objection, or something of that kind. From all the conversations I had with Mr. Tipton about this matter, I supposed, at the time I made this deal, that the railroad company would be very willing to transfer or make new contracts, and I presume Mr. Galbreath thought the same. We expected to fill the unfinished part of these contracts this year, and, of course, expected other contracts."

Tipton testified, with respect to these interviews, that "Mr. Galbreath and Mr. Wallrich called on me in regard to entering into a partnership, or buying out Charles A. Galbreath & Company. Mr. Wallrich and Mr. Kellogg wished to know if it would be satisfactory for them to enter into a partnership, or buy out Charles A. Galbreath & Company, and I told them that, so far as I was concerned, and the company, it would be perfectly satisfactory; that Mr. Kellogg had gotten out ties and timber for the company for a long time, and his services had always been satisfactory, and I would do what I could to help them along." He further says: "I had a great many conversations with these parties, and I only know the substance of what I said. I was perfectly willing to make the transfer at those times. Mr. Kellogg had worked for the railroad company for a number of years, and I would have been glad to please him."

"I told them that I would be glad to have them connect themselves with the concern; that I would arrange it so that the contracts could be transferred or new ones issued. At any rate, I would fix it so that they could carry on the business. * * * I assured them that I would be glad to see them take hold with Messrs. Charles A. Galbreath & Company, and I would fix up the contracts to suit them, either by assignment, or making new ones. We did not make the assignments or make new contracts, because, upon advice of our legal department, we were stopped from taking timber from government land."

March 3rd following the contracts of purchase, and after the defendants had entered into possession of the business, Mr. Tipton, as purchasing agent of The Denver & Rio Grande Railroad Company, notified Charles A. Galbreath & Company that the company elected to cancel its tie contracts, and notified

Galbreath & Company to discontinue cutting timber from the government lands thereunder, because, by recent decisions of the supreme court of the United States, timber could not be lawfully taken from government lands for use of the railroad company. This notice was at once transmitted to The Rio Grande Lumber & Supply Company by Galbreath & Company.

It appears that, some weeks prior to the consummation of the deal between the parties, negotiations were commenced. Wallrich says that, when they first talked about the deal, it was understood that Galbreath & Company were to assign the tie contracts, or secure new ones from the company, 'for the balance that had not been filled. The day prior to the date when the contract of sale was entered into, he says: "Mr. Galbreath was either to get them assigned or else reappointed, the same as we talked of before. This was the 24th. We were to be placed in the same position that Charles A. Galbreath & Company were in, because he stated that absolutely, that there would be no trouble with that, with getting this transferred."

Mr. Kellogg testifies: "Mr. Galbreath was to invest us with the same rights that he had there in the contracts by assignment or having new contracts issued. Mr. Galbreath said that he would arrange to have these contracts transferred or new ones made out for the substitution of them, for the benefit of the new company." Galbreath denies that he agreed to obtain the consent of the railroad company to the transfer of the tie contracts.

This brings us to the vital question involved, viz.: Was it necessary to secure the formal assent of the railroad company to the assignment of the contracts, after the execution of the contract between plaintiffs and defendants, and the assumption of the

control of the business by the latter? Wallrich and
Kellogg testified that Galbreath was to secure such
assent; but if he did agree to do so, and had he
obtained such consent, the rights of the defendant
would have been no different, for the obvious reason
that the purchasers already had that consent. Wall-
rich and Kellogg interviewed Tipton with the view
of ascertaining if the railroad company would as-
sent to the assignment of the tie contracts—that is,
accept the purchasers of the business of Galbreath
& Company in lieu of the latter. He stated he would.
On the strength of this statement, which it was not
necessary to evidence by writing, the business of
Galbreath & Company, including the contracts, was
purchased by the defendants. This was a sufficient
consideration to sustain the assent of the railroad
company, and it was bound thereby.—*Simonds v.
Pierce,* 51 Vt. 467. In such circumstances, the rail-
road company was estopped from withholding its
assent after the purchase by the defendants.—*Fos-
ter v. Newland,* 21 Wend. 93; *Petrie v. Feeter, ibid.,*
172.

This conclusion is based upon the principle that
a party to a contract is estopped on grounds of pub-
lic policy and good faith from refusing to fulfill a
promise with respect to such contract, which was the
inducing cause of others to take an assignment there-
of.—4 Cyc. 62; *Stebbins v. Bruce,* 80 Va. 389.

The railroad company is not a party to this
action, and neither party is seeking to enforce the
contracts in question against it, but, in order to
ascertain the status of the parties, it is necessary to
determine what the rights of the defendants, under
the facts of this case, would be as against the rail-
road company. It did not refuse its assent because
of any claim upon its part that it had not been previ-
ously given, or that Mr. Tipton was without author-

ity to grant it. It was not dissatisfied with the defendants, or unwilling that they should complete the contracts, but based its action in canceling them upon the ground that a decision of the supreme court of the United States inhibited it from cutting timber from the public lands. There was no fraud or concealment on the part of the plaintiffs. They knew nothing of this decision, or that the railroad company would cancel the contracts. The plaintiffs were in no manner responsible for such cancellation. That action may have affected the value of the business which the defendants purchased, and the contracts, in particular, but at that time the defendants owned them, and whatever loss was thus entailed, they must bear. They have received all they purchased. If their expectations as to the future business were not realized, that was a misfortune for which plaintiffs are not legally responsible. A purchaser cannot successfully complain that the vendor did not perform some act agreed upon which did not affect the rights of the former in, or title to, the article purchased.—*Scott v. Jackson,* 89 Cal. 258. According to the undisputed testimony, the defendants were not entitled to rescind the contract. On the contrary, the judgment should have been in favor of plaintiffs for the balance of the purchase money remaining unpaid. The judgment of the district court is, therefore, reversed, and the cause remanded with directions to enter judgment accordingly, and grant plaintiffs such further relief as the testimony bearing upon the issues tendered by their original complaint entitles them to.

After the trial court had announced what its judgment would be, but before the judgment was formally pronounced and entered, the defendants filed upon certain timber lands in the vicinity of the sawmills purchased, which act plaintiffs claim was

contrary to their agreement with them. Plaintiffs thereupon filed a supplemental complaint, which, according to their claim, from the facts therein stated, precluded the defendants from rescinding the contract of purchase. In view of the judgment ordered, we do not deem it necessary to pass upon the questions raised by this pleading.

Judgment reversed, and cause remanded with directions.

<em>Reversed and remanded.</em>

CHIEF JUSTICE STEELE and Mr. JUSTICE HILL concur.